**E-FILED**
**CNMI SUPREME COURT**
E-filed: Mar 13 2026 05:03PM
Clerk Review: Mar 13 2026 05:04PM
Filing ID: 78716464
Case No.: 2024-SCC-0022-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**IN THE MATTER OF THE ESTATE OF FRANCISCO OMAR KAPILEO,**
*Deceased.*

**Supreme Court No. 2024-SCC-0022-CIV**

---

**SLIP OPINION**

**Cite as: 2026 MP 02**

Decided March 13, 2026

———————

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE JOHN A. MANGLOÑA
JUSTICE PRO TEMPORE PERRY B. INOS

———————

Superior Court No. 21-0295
Associate Judge Joseph N. Camacho, Presiding

———————

CASTRO, C.J.:

¶ 1    This case arises from an heirship determination in the estate of Francisco Omar Kapileo ("Francisco"), a person of Northern Marianas Descent. Sarah Kapileo ("Sarah") claims to be Francisco's daughter and sole heir. The probate court rejected her claim, relying on DNA evidence. Sarah challenges the admissibility of the DNA test results, the heirship determination, and the rejection of her asserted ownership interest in Francisco's homestead through a quitclaim deed from her mother, Rungthip Sartklang Kapileo ("Rungthip"). For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2    Francisco, a person of Northern Marianas Descent, married Rungthip, a Thai citizen, in 2000. App. at 11. Rungthip gave birth to Sarah in 2004. Francisco is listed as Sarah's father on her birth certificate.

¶ 3    In 2011, Rungthip relocated to Guam while Sarah remained with Francisco in Saipan. Four years later, in 2015, Rungthip brought Sarah to Guam. In 2017, Rungthip filed for divorce in Guam. Francisco was purportedly served by mail at a Saipan mailbox registered to an individual named Thitiporn Kubota and by publication in Guam. Francisco did not appear in the divorce proceedings. In December 2017, the Superior Court of Guam entered an Interlocutory Judgment of Divorce by Default and a Final Decree of Divorce in *Kapileo v. Kapileo*, DM0416-17 (Guam Super. Ct. Dec. 13, 2017) ("Guam decree") awarding Francisco's homestead property, Lot No. 011 G 1038 ("Homestead"), to Rungthip. The Homestead is located in Kagman, Saipan. Francisco continued to reside in the Homestead until his death in 2021. Rungthip took no action to enforce or register her property interest during Francisco's lifetime. Following Francisco's death, Rungthip executed a quitclaim deed in December 2022 purporting to convey her interest in the Homestead to Sarah.

¶ 4    In 2021, Vivian Omar Kapileo ("Vivian"), Francisco's sister, petitioned the court to probate Francisco's estate and be appointed administratrix. During the hearing on this petition, Vivian's counsel stated Vivian and her family questioned Sarah's biological relationship to Francisco, explaining the family believed he was incapable of fathering children. Counsel further represented he had spoken with Rungthip and Sarah and both had consented to a DNA test. Sarah, then seventeen, was present at the hearing. Based on counsel's representations, the probate court ordered the DNA test "[w]ith the consent of the minor child and the child's natural mother."

¶ 5    The DNA test compared the DNA of Sarah and Francisco's brother, Vicente Kapileo. The results indicated it was "1,000 times more likely that [Vicente] is unrelated to the child [Sara] as opposed to related." Marla Salik, who was an adult, but not Sarah's legal guardian, accompanied Sarah to the testing site and signed the Lab Corp client authorization form. Melanie S. Trapani, PhD. ABC-MB signed the accompanying certification stating she "read the foregoing report on the analysis of specimens from the above-named individuals, signed by

myself, and under penalty for perjury it is my belief that the facts and results therein are true and correct." A notary public certified Dr. Trapani personally appeared and declared in writing she was authorized by LabCorp to execute the document on the corporation's behalf in Burlington, North Carolina.

¶ 6    Following receipt of the DNA results, the probate court held an evidentiary hearing in July 2023. At the hearing, Sarah moved to exclude the DNA test results, arguing that they (1) failed to comply with the requirements for expert testimony and (2) was barred by the rule against hearsay. These arguments were rejected, with the court holding the results conveyed proper expert testimony and fell into the hearsay exceptions for records of a regularly conducted activity, family records, and medical records.

¶ 7    Sarah also argued she had not consented to the DNA test and it was therefore an unreasonable search and seizure under the Fourth Amendment. Because Sarah was a minor, she needed a parent or guardian to consent to the DNA test. Sarah argues Rungthip did not give true voluntary consent because Rungthip believed Vivian's counsel was her counsel and that she could not object to counsel's directions. The probate court found this testimony not credible.

¶ 8    The Order Denying the Motion to Strike the DNA Test Result on June 18, 2024 held the probate court possessed broad authority under 8 CMC § 2202 to determine heirship. The order found the DNA test was necessary to resolve the issue of parentage because, without such a test, there would have been no way around the 8 CMC § 1704 rebuttable presumption that a husband has fathered a child born to his wife during the marriage. Sarah had argued the DNA test result only proved she was not related to Vicente and cannot prove she was not related to Francisco. The probate court held there was no evidence presented that either Vicente or Francisco was adopted. Even if they were half-brothers, Sarah and Vicente would still be related through Francisco's mother. As there was a need for the DNA test, the order claimed consent was not required for the court to order the testing and further held that Sarah's Fourth Amendment interests did not overcome the necessary and proper need for the DNA test.

¶ 9    On the same date, the probate court issued an order holding Sarah was not Francisco's biological child. It further ordered the Guam divorce was void *ab initio* under Article XII of the NMI Constitution to the extent it purported to convey the Homestead to Rungthip. Article XII restricts long-term in land ownership to people of Northern Marianas Descent (NMD). Since Rungthip could not lawfully acquire the Homestead, she likewise could not transfer any interest in it to Sarah.

## II. JURISDICTION

¶ 10    We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3.

## III. ISSUES ON APPEAL AND STANDARD OF REVIEW

¶ 11    This appeal presents four issues. First, we will examine whether the quitclaim deed from Rungthip granted Sarah any legal interest in the Homestead.

This issue involves the validity and enforceability of the Guam decree, the applicability of Article XII of the CNMI Constitution restricting land ownership, and due process concerns arising from the service of process in the Guam proceedings. These are questions of law reviewed de novo. *See Adam v. Saengar*, 303 U.S. 59, 62–64 (1938) (analyzing a court's refusal to afford full faith and credit to a sister court's judgment based on constitutional defects without deference); *Commonwealth v. Fu Zhu Lin*, 2014 MP 6 ¶ 9 (holding the standard of review for constitutional issues is de novo).

¶ 12 Second, we must determine whether ordering a DNA test violated Sarah's rights. The inquiry begins with whether consent was needed to order a DNA test. This issue implicates the Fourth Amendment of the U.S. Constitution, the Article I, Section 3 of the NMI Constitution protection against unreasonable search and seizure, and the Article I, Section 10 of the NMI Constitution safeguard of individual privacy. We review constitutional and statutory interpretations de novo. *Fu Zhu Lin*, 2014 MP 6 ¶ 9; *Deleon Guerrero v. Dep't of Pub. Lands*, 2011 MP 3 ¶ 9. Next, we will determine whether the factual finding that Sarah and Rungthip had consented to the DNA test is substantiated. We review factual determinations for clear error. *Commonwealth v. Kaipat*, 2022 MP 9 ¶ 14.

¶ 13 Third, we will address whether the DNA test results were inadmissible hearsay, violating Rule 802 of the Rules of Evidence. The results were admitted through the records of regularly conducted activity exception or, in the alternate, the family history exception or the medical records exception to the hearsay rule. We will also consider whether the DNA test results violated Rule 702 of the Rules of Evidence which governs expert testimony. We review evidentiary findings under Rules 702 and 802 for an abuse of discretion. *Commonwealth v. Crisostomo*, 2018 MP 5 ¶ 12; *Commonwealth v. Togawa*, 2016 MP 13 ¶ 14.

¶ 14 Finally, we will consider whether the probate court erred in concluding Sarah was not an heir. Determinations of heirship are reviewed de novo. *In re Estate of Kaipat*, 2010 MP 17 ¶ 5.

## IV. DISCUSSION

### A. The Guam Decree Cannot Distribute Real Property in the CNMI Without Personal Jurisdiction Over Both Spouses

¶ 15 We first address the threshold question of whether the Homestead remained in Francisco's estate. Sarah asserts title to the Homestead through a quitclaim deed from her mother, who in turn claims the Homestead by virtue of the Guam decree awarding the property to her. The Homestead is the only asset in the estate's inventory. Because the answer to this question determines whether any asset exists to distribute, it is dispositive of the remaining issues on appeal, and therefore we resolve it first.

¶ 16 We recognize judgments from sister-jurisdictions in the United States and grant them full faith and credit in the CNMI. 28 U.S.C. § 1738; Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1824. In general, this requires

accepting the judgment without examining its reasoning. *V.L. v. E.L.*, 577 U.S. 404, 407 (2016). But those principles do not require recognition where the sister court lacked jurisdiction to grant the relief sought or where such recognition would contravene constitutional requirements, including due process protections and land alienation restrictions. *Id.* (explaining full faith and credit is not afforded to a judgement entered without jurisdiction); *Baker v. GMC*, 522 U.S. 222, 235 (1998) (discussing how orders are "denied enforcement in a sister [s]tate where they purport to accomplish an official act within the exclusive province of that other state" such as transferring title).

¶ 17    The United States Supreme Court has long recognized a court may adjudicate marital status on the basis of jurisdiction over one spouse. However, due process prevents a court from adjudicating or transferring property rights located in another sovereign absent jurisdiction over the property or the absent spouse. *See Estin v. Estin*, 334 U.S. 541, 548 (1948) (holding jurisdiction over intangible property in a divorce comes from jurisdiction "over the persons whose relationships are the source of the rights and obligations"); *Smith v. Smith*, 535 P.2d 1109, 1115 (Haw. 1975) (recognizing as a general principle of common law that a divorce court in one state cannot affect title to real property in another state).

¶ 18    To have jurisdiction over a nonresident defendant, the nonresident defendant must have "minimal contacts with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Banes v. Superior Court of Guam*, 2012 Guam 11 ¶ 28 (quoting *Int'l Shoe Co. v Washington*, 326 U.S. 316 (1945)) (finding an NMI resident purchasing a condominium in Guam through the mail insufficient contact to give a Guam court jurisdiction); *see also Snider v Snider*, 551 S.E.2d 693, 698–99 (W. Va. 2001) (finding sufficient contacts for due process purposes where nonresident defendant purchased property in West Virginia, actively maintained marital relationship with resident plaintiff, and lived in property when staying in West Virginia).

¶ 19    Here Francisco did not appear in the Guam divorce proceedings. Service on him consisted only of mailed notice to a mailbox bearing a third party's name and publication in a Guam newspaper. Other than his marriage to Rungthip, who moved there years after their separation, there is no evidence Francisco had any connection to Guam at all. The record contains no evidence he ever lived, worked, or owned property on Guam or purposefully availed himself of Guam's laws or protection. The methods of service and Francisco's highly attenuated, single connection to Guam do not constitute sufficient minimum contacts to make Guam's jurisdiction over the Homestead constitutional. Therefore, we do not grant full faith and credit the portions of the Guam decree that attempted to distribute the Homestead to Rungthip. The Homestead remains a part of Franscico's estate, to be distributed according to probate law.

¶ 20    Even if the due process concerns discussed above were not present, the probate court correctly concluded Article XII of the NMI Constitution bars this

transfer of land to a non-NMD person. Article XII restricts long-term interests in land in the CNMI to persons of Northern Marianas descent. This constitutional restriction governs the validity of any conveyance of land within the CNMI: a judgment or conveyance which purports to confer title in contravention of Article XII is void as to the land. *See Wabol v. Villacrusis*, 958 F.2d 1450, 1461–62 (9th Cir. 1992) (recognizing the supremacy of local constitutional restrictions on alien land ownership and refusing to give effect to conflicting conveyances). Thus, even if the Guam decree had jurisdiction to award the Homestead to Rungthip, such an award could not lawfully convey a long-term interest in CNMI land to a non-NMD person and any provision in the decree purporting to do so would be void. *See Diamond Hotel Co. v. Matsunaga*, 4 NMI 213, 220 (1995) (stating offending provisions should be voided to "save the agreement'); *Jing Yu Guan Stephanson v. Teregeyo*, 2008 MP 13 ¶ 20 (severing a provision granting the right to collect rent to a non-NMD person).

¶ 21    The practical legal consequence of our holding is straightforward: because the Guam decree did not vest title in Rungthip, she possessed no legally cognizable interest in the Homestead she could transfer to Sarah by quitclaim. A quitclaim transfers only what interest the grantor possesses at the time of execution; it cannot convey greater title than was held by the grantor. *See In re Fleming*, 2005 MP 13 ¶ 9 (discussing limited impact of a valid quitclaim deed). As Rungthip held no valid interest, the quitclaim to Sarah conveyed no operative title and did not divest any rights to the Homestead from Francisco's estate.

¶ 22    For these reasons, the Homestead remained part of Francisco's estate.

### B. Whether Ordering a DNA Test Violated Sarah's Rights

¶ 23    When the probate court ordered the DNA test, it did so "[w]ith the consent of the minor child and the child's natural mother." However, after Sarah challenged the validity of their consent, the probate court concluded that "[a]s there was a need for a DNA test to be done, *consent was not necessary* for the Court to order it" (emphasis added). This asserted authority is exceptionally broad.

¶ 24    To resolve this inconsistency, we must address two distinct questions. First, we consider whether ordering a DNA test without consent is constitutionally permissible. Second, we determine whether the DNA test was ordered and conducted with valid consent. Because voluntary consent constitutes an exception to the constitutional prohibition against unreasonable searches and seizures, the existence of such consent would obviate any constitutional violation. *See Commonwealth v. Kaipat*, 2022 MP 9 ¶ 17 (stating voluntary consent is an exception to the firm rule warrantless searches are unreasonable).

¶ 25    A search or seizure occurs when a government actor intrudes upon an individual's reasonable expectation of privacy. *Id.* ¶ 20. In *Kaipat*, we held an individual has a reasonable expectation of privacy in DNA obtained through a buccal swab under both the Fourth Amendment to the United States Constitution and Article I, Section 3 of the NMI Constitution. *Id.* ¶ 23. *Kaipat* involved a

criminal case, but constitutional protections against unreasonable searches and seizures do not disappear in the civil context. *See Bernstein v. Roberts*, 405 F. Supp. 2d 34, 40 (D.D.C. 2005) (stating "courts have never made a distinction in their Fourth Amendment analyses between criminal cases (i.e., warrants) and civil cases (i.e., writs)"); *Tenebaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999) (treating the civil seizure of a minor without a court order as equivalent to a warrantless search). The government actor ordering the search is the court through its order. *See Draper v. Gentry*, 532 P.3d 1153, 1159 (Ariz. 2023) (holding a court order is state action); *United States v. Meals*, 21 F.4th 903, 906 (5th Cir. 2021) (discussing how private action becomes governmental action when directed by the government); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982) (holding state officials assisting private actors according to a statute turns those private actors into state actors). The order therefore implicated constitutional protections against unreasonable searches and seizures.

¶ 26     The remaining question is whether the search was reasonable. The reasonableness of the search is determined by balancing a person's privacy interest with any governmental interests in the totality of the circumstances. *Kaipat*, 2022 MP 9 ¶ 17; *Maryland v. King*, 569 U.S. 435, 448 (2013).

*1. Privacy Right Implicated by DNA Test Required Compelling Government Interest*

¶ 27     A buccal swab constitutes a minimal physical intrusion and implicates only a slight safety or bodily integrity interest. The United States Supreme Court has characterized the significantly more invasive procedure of a blood draw as one which "involve[s] virtually no risk, trauma, or pain." *Schmerber v. California*, 384 U.S. 757, 771 (1966). A buccal swab, which does not pierce the skin and requires only a brief collection of saliva from the inside of the cheek, is even less intrusive. Indeed, this Court has described the procedure as "brief and harmless." *Kaipat*, 2022 MP 9 ¶ 65. The physical intrusion associated with buccal swab DNA testing weighs only minimally in the constitutional balance.

¶ 28     The more substantial concern arises from the intrusion on an individual's dignity and privacy interests. "[V]irtually any intrusion into the human body" triggers "constitutional scrutiny." *Id.* ¶ 23 (citing *Maryland v. King*, 569 U.S. at 446). We have expressly recognized a privacy interest inherent in DNA specifically. *Id.* Unlike the federal constitution, which contains no express right to privacy, Article I, Section 10 of the NMI Constitution explicitly provides that "[t]he right of individual privacy shall not be infringed except upon a showing of compelling interest."

¶ 29     We have also recognized a privacy right to "protect[] a person from unconsented physical intrusions into his or her body." *Elameto v. Commonwealth*, 2018 MP 15 ¶ 17. An unconsented medical examination is an "invasion of privacy." *Id.* ¶ 22. Even without explicit constitutional privacy provisions, compelled DNA tests have been restricted based on the federal privacy right that emerges in the constitutional "penumbras." *In re L.*, 632 A.2d 59, 61 (Conn. Super. Ct. 1993).

¶ 30    Here, the probate court ordered a medical procedure which required the physical extraction and analysis of Sarah's DNA. DNA is uniquely sensitive biological information the body uses to create and regulate itself. *See United States v. Krisel*, 508 F.3d. 941, 947–48 (9th Cir. 2007) (noting DNA not only identifies a person but also contains information on their health, vulnerability to particular diseases, demographic information, and perhaps even propensity to certain conduct). Courts have therefore recognized the privacy interest in DNA, separate from the collection of the sample, is "strong" but "not absolute." *Cty. of San Diego v. Mason*, 147 Cal. Rptr. 3d 135, 138–39 (Cal. Ct. App. 2012); *see also United States v. Mitchell*, 652 F.3d 387, 406–07 (3rd Cir. 2011) (treating the analysis of the DNA as a "second search" separate from its collection). Because this was a medical procedure involving both bodily intrusion and genetic analysis, the order can be sustained only upon a showing of either a compelling government interest that outweighs constitutional privacy protections or valid consent.

*2. There Was No Compelling Government Interest to Order a DNA Test*

¶ 31    In concluding consent was unnecessary, the probate court relied in part on *In re J.M.*, a Louisiana Supreme Court decision which addressed the balancing of state interests in resolving paternity disputes and personal privacy interests under the Fourth Amendment. 590 So. 2d 565, 568 (La. 1991). That case recognized, in certain circumstances, the state's interests may justify compelling a prospective father to submit to blood testing. Those interests include protecting the welfare of children, preserving public assistance resources, and ensuring children receive financial and emotional support from their parents. *Id.* Those interests, however, play no role in the context of litigating a presumptive heir's paternity in probate. Here, the DNA test did not serve to establish a parental relationship, secure child support, or advance Sarah's welfare. To the contrary, the test had only two possible outcomes: either to confirm an existing legal and familial relationship or to sever it entirely. The test would not preserve public resources, protect a vulnerable child, or impose parental obligations. Consequently, the governmental interests identified in *In re J.M.* do not make a compelling justification for compelled genetic testing in this case.

¶ 32    The probate court also found persuasive the reasoning of *In re Estate of Larry Lee Hillbom*, Civil Action No. 95-626 (NMI Super. Ct. Feb. 6, 1996) (Order Granting Motion for DNA Testing and Motion for Commission to Produce Bodily Samples). *Hillblom* involved markedly different circumstances: the decedent's body was never recovered, multiple individuals claimed to be his biological children, and there existed no legal presumption of parentage in favor of any claimant. *Id.* at 1–2. The *Hillblom* court ordered a DNA test of the decedent's relatives—over their objections—because it was the only available means of assessing the credibility of the competing claims. *See id.* at 4–5 (finding a DNA test would be highly probative and having already established other means of establishing a parental relationship were uncertain). The purported heirs in *Hillblom* had no other legal relationship to the decedent. As the decedent's

body was missing, there was no other way of determining the purported heirs' claims.

¶ 33    Here, by contrast, Sarah was listed as the sole heir. Francisco was married to her mother at the time of her birth, identified as her father on her birth certificate, and held her out as his child. These facts gave rise to a strong legal presumption of legitimacy and paternity. The presumption placed the burden on those challenging Sarah's heirship to rebut it. Sarah bore no obligation—legal or equitable—to affirmatively prove her paternity through biological evidence. Unlike *Hillblom*, the probate court was not faced with multiple claimants, a missing body, or the absence of a legal framework governing parentage. There was not a need to compel biological evidence to adjudicate heirship.

¶ 34    This conclusion is consistent with broader constitutional principles recognizing biological connection alone does not invariably outweigh established legal and familial relationships. In *Michael H. v. Gerald D.*, the United States Supreme Court held the federal Constitution does not confer upon a biological father, in the absence of statutory authorization, the right to demand judicial recognition of paternity based solely on genetic evidence. 491 U.S. 110, 119 (1989). There, a putative father presented DNA evidence showing a 98.07% probability of paternity, yet the Court upheld California's statutory presumption favoring the legitimacy of a child born into a marriage. *Id.* at 114–15, 122–25. The Court reasoned the State's interest in preserving the integrity and stability of the marital family outweighed the biological father's asserted liberty interest. *Id*

¶ 35    If biological evidence alone is insufficient to overcome the presumption of legitimacy in favor of protecting an intact family, it follows there is no compelling governmental interest to compel a DNA test of a presumptive heir based on vague suspicions raised by interested parties. Balancing the private and governmental interests in the totality of the circumstances, our Constitution does not permit the privacy interests inherent in a child's body and genetic identity to be placed at issue absent a showing of necessity sufficient to overcome the strong protections afforded by the Fourth Amendment of the U.S. Constitution and Article I, Sections 3 and 10 of the NMI Constitution.

### 3. Sarah and Rungthip Voluntarily Consented to the DNA Test

¶ 36    Voluntary consent is a well-established exception to an otherwise unreasonable search and seizure. *Kaipat*, 2022 MP 9 ¶ 17. The probate court explicitly mentioned both Sarah and Rungthip's consent when ordering the DNA test. We have previously held when a buccal swab is sought from a minor criminal defendant, both the minor and the minor's legal guardian must give voluntary consent. *Id.* ¶ 58; *see also* 7 CMC § 3401 (adopting the common law "as generally understood and applied in the United States"); *American Academy of Pediatrics v. Lungren*, 940 P.2d 797, 801 (Cal. 1997) (discussing how requiring consent from both a minor and their guardian for a medical procedure is the common law rule "throughout the United States").

¶ 37    Consent may be express or implied and does not require any particular language. *Kaipat*, 2022 MP 9 ¶ 41. For Fourth Amendment purposes, however, consent must be voluntary. *Id.* ¶ 17. Although consent ordinarily implies voluntariness, compliance alone may establish consent but not voluntariness. *Id.* ¶ 26. When a person complies with orders as a result of coercive pressure or duress, the result is "mere acquiescence." *Id.* ¶ 47. Mere acquiescence does not trigger the consent exception because it is involuntary. *Id.* ¶ 35. A court distinguishes implicit consent from mere acquiescence by looking to whether a reasonable officer would have believed the person gave voluntary consent, taking into account factors such as if the person knew they could refuse to consent. *Id.* ¶¶ 37, 67.  Ignorance of the right to refuse, however, is not dispositive. *Id.* ¶ 37.

¶ 38    To illustrate the distinction between voluntary consent and mere acquiescence, we have favorably cited *State v. Rios*, 371 P.3d 316 (Idaho 2016). *Kaipat*, 2022 MP 9 ¶ 48. In *Rios*, the defendant expressly declined to consent to a blood test, thereby revoking the implied consent created by Idaho's implied-consent statute. 371 P.3d at 319. Although the defendant thereafter complied with the officer's directive by extending his arm, the Idaho Supreme Court held such compliance, following an explicit refusal, could not be construed as voluntary consent. *Id.* at 322. The Court emphasized compliance in the face of asserted authority is fundamentally different from a free and voluntary choice. *Id.*; *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1327–28 (9th Cir. 1997) (finding lack of voluntary consent where officer makes request with his hand on his firearm and defendant wordlessly raises a tarp); *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (finding lack of voluntary consent where defendant stated he "guess[ed]"officers could search because they had a badge); *State v. H.K.D.S.*, 469 P.3d 770, 773–74 (Or. Ct. App. 2020) (finding mere acquiescence where minor was simply told a buccal swap would be conducted with no opportunity to object).

¶ 39    In *Kaipat*, the defendant claimed to be a victim and initially cooperated with the police. *Kaipat*, 2022 MP 9 ¶ 66. He only began objecting after the DNA test results implicated him in a crime. *Id.* ¶ 9. To show coercion, the defendant testified he was hungry, tired and cold during the interrogation, but did not assert the Commonwealth was responsible for making him hungry or tired. *Id.* ¶¶ 60–61. The police officers interviewing him asked him to remove his sweater and spin around without explanation. *Id.* While strange, he failed to provide any evidence this interaction caused duress or coercion which caused him to cooperate with the testing a few days later. *Id.* His parent brought him to the police station at an agreed upon time and neither parent nor child objected to the DNA collection. *Id.* ¶ 66. Despite this, the defendant's mother later inconsistently testified she had not consented to the DNA test and she had not been properly informed DNA would be collected. *Id.* ¶¶ 63–64, 67. We held the officers could reasonably conclude the defendant and his parents had implicitly and voluntarily consented, given their conduct and their continued cooperation. *Id.* ¶ 67.

¶ 40    The circumstances here are materially similar. Sarah and Rungthip cooperated with the testing until the results indicated Sarah was not Francisco's biological child. Before testing, they represented to the probate court that Sarah was Francisco's child and had agreed with Vivian's counsel to a DNA test as a means of expeditiously resolving objections raised by Francisco's siblings. Attending the hearing, they did not object when Vivian's counsel asked for the DNA test and represented Sarah and Rungthip had consented. Sarah appeared at the testing site and made no objections before the test was conducted. Rungthip, like the defendant's mother in *Kaipat*, now maintains she did not consent to the DNA test. Unlike the criminal defendant in *Kaipat*, neither Sarah nor Rungthip claim to have been subjected to any form duress or coercion from the Commonwealth or anyone acting on its behalf. Moreover, consent was requested throughout the process. The order stated it was acting with their consent. At the testing site, LabCorp provided consent forms to take the test.

¶ 41    The evidence supports a finding that both Sarah and Rungthip voluntarily consented to the DNA test. Sarah went willingly to the testing site and signed the consent forms herself, expressly agreeing to test voluntarily. Sarah had an adult friend accompany her to the testing site. Although Sarah's friend signed the form as her "legal guardian"—falsely representing that status—this irregularity does not negate Sarah's own express consent.

¶ 42    As Sarah was a minor, Rungthip's consent was also required. We give the probate court's credibility determinations "due regard" and so review the decision to discredit Rungthip's testimony that she believed she could not object to the DNA test for clear error. 1 CMC § 3103; *Pangelinan v. Pangelinan*, 2024 MP 5 ¶ 58. The record reflects a disputed conversation between Rungthip and Vivian's counsel about the DNA test. Counsel claim she explained the nature and consequences of testing and informed consent in good faith.[1] Rungthip testified she objected to the DNA test but complied under the mistaken belief she could not disagree with counsel and counsel was her lawyer and represented her interests. At the same time, Rungthip acknowledged meeting with counsel and discussing both the case and DNA test result in detail.

¶ 43    Acting as trier of fact, the probate court evaluated Rungthip's testimony and found her claims of misunderstanding and objecting not credible. There was a specific finding that Rungthip understood the purpose and implications of the DNA test to be performed on Sarah. Despite this understanding, Rungthip did not prevent Sarah from going to the testing facility, or communicate her objection to the court or to the testing facility before the test was conducted. Based on these

---

[1]    The ensuing dispute in this matter illustrates the risks inherent in relying on counsel's representations regarding a party's consent. As we have repeatedly emphasized, statements and arguments of counsel are not evidence. *See Commonwealth v. Cepeda*, 2009 MP 15 ¶ 17. To avoid similar disputes in future proceedings, probate courts should insist consent to DNA testing be clearly established on the record, either through written consent or sworn oral consent before the court, from the individual to be tested and, where the individual is a minor, from the minor's legal guardian as well.

facts, the probate court reasonably concluded Rungthip implicitly and voluntarily consented to the DNA testing.

¶ 44    No evidence suggests Sarah or Rungthip acted under duress or coercion. This probate proceeding bears little resemblance to the custodial interrogations or coercive searches addressed in our Fourth Amendment and Article I, Section 3 jurisprudence. *C.f. Kaipat*, 2022 MP 9 ¶ 40 (citing *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997)) (considering factors such as whether a person is in custody, an officer has a weapon drawn, *Miranda* warnings were issued, the person was informed of their right to refuse, and the person was told of the possibility of a search warrant). There were no threats, displays of authority, or physical restraints. The probate court was informed—and reasonably believed—Sarah and Rungthip had voluntarily agreed to DNA testing as a means of resolving the heirship dispute. In the absence of coercion, Rungthip's failure to object constituted implicit voluntary consent. The finding of consent was therefore not clear error.

¶ 45    Reading the order as grounded in the voluntary consent exception accords with both its language and purpose. The practical effect of the order was to authorize LabCorp to perform testing it otherwise could not conduct without court approval. The order did not compel unwilling parties to submit to testing; it facilitated an option the parties had already chosen in an effort to resolve the dispute efficiently. Having concluded the DNA test was conducted pursuant to voluntary consent, we next address Sarah's challenge to the admissibility of the DNA results.

*C. Whether Hearsay Rule Barred Admission of the DNA Test Results*

¶ 46    Sarah argues even if the DNA sample was lawfully obtained, the resulting laboratory report was inadmissible hearsay and should have been excluded. Hearsay is an out-of-court statement offered in court for the truth of the matter asserted. NMI R. EVID. 801. A court's decision to admit hearsay evidence is reviewed for abuse of discretion. *Commonwealth v. Togawa*, 2016 MP 13 ¶ 14. Here, the DNA test results were prepared in Burlington, North Carolina and offered to prove Vicente and Sarah were not biologically related. As such, the results are hearsay unless they fall under a recognized exception. The probate court admitted the DNA test results under 803(6) records of a regularly conducted activity exception, or alternatively, under the 803(13) family records exception

and the 803(4) medical history exception. NMI R. EVID. 803. Neither the 803(4) medical records[2] nor the 803(13) family records[3] exceptions are applicable.

¶ 47    We turn next to the records of regularly conducted activity exception under 803(6). This exception admits hearsay that describes an act, event, condition, opinion, or diagnosis only where:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.
> NMI R. EVID. 803(6).

¶ 48    Here, the probate court ordered the DNA test from LabCorp, a vendor routinely utilized by the NMI Judiciary, to conduct DNA testing pursuant to 8 CMC § 1711. This statute places the power and responsibility of selecting DNA test vendors on the Judiciary for the purposes of establishing paternity. Of 803(6)'s five conditions to meet the hearsay exception, four are met without controversy. LabCorp or one of its agents created the report near the time they

---

2    The medical records exception requires the information at issue be "made for" and "reasonably pertinent" to medical diagnosis or treatment. NMI R. EVID. 803(4); *see also Commonwealth v. Bergonia*, 3 NMI 22, 32–33 (1992) (finding a child victim's identification of their abuser fits under this exception as the identity of the abuser is relevant to their medical treatment). The purpose of this DNA test was to resolve the legal question of whether Sarah was Francisco's heir and was not related to any medical diagnosis or treatment.

3    The family records exception permits the admission of "[a] statement of fact about personal or family history contained in a family record, such as a Bible, genealogy, chart, engraving on a ring, inscription on a portrait, or engraving on an urn or burial marker." NMI R. EVID. 803(13). These items were viewed as being valuable and sentimental enough for it to be unlikely a family would fabricate records solely for the purpose of litigation. *See* Randolph N. Jonakit, *The Subversion of the Hearsay Rule: The Residual Hearsay Exceptions, Circumstantial Guarantees of Trustworthiness, and Grand Jury Instructions*, 36 CASE W. RES. 431, 471 n.153 (1986) (citing M. GRAHAM, EVIDENCE: TEXT, RULES, ILLUSTRATIONS AND PROBLEMS 224 (1983)) (arguing a family would not allow an untruthful entry without protest); *In re Colbert's Estate*, 153 P. 1022, 1025–26 (Mont. 1915) (admitting as evidence a "mutilated portion of a Bible" because it was a family Bible despite finding as evidence it "may be worse than worthless"). Here, the record was generated by a corporation in North Carolina for purposes of resolving this litigation.

ascertained the test results, satisfying 803(6)(A). LabCorp regularly creates such reports as part of its ongoing relationship with the Judiciary, a business relationship, satisfying 803(6)(B). DNA tests consistently lead to LabCorp creating a report describing those results; if LabCorp did not create and communicate such test results, it would not have been selected as an expert for purposes of 8 CMC § 1711. Communicating test results is an inherent and routine component of a DNA test services, satisfying 803(6)(C). No facts suggest the DNA test was unreliable or deviated from normal procedures, satisfying 803(6)(E). However, all the elements must be present to qualify for the hearsay exception and 803(6)(D) may only be satisfied through a qualified witness, a certification that complies with either Rule 902(11) or 902(12),[4] or a statute that permits certification. Here, no witness testimony laid the foundation for a regularly conducted activity. Accordingly, admissibility turns on whether the certification accompanying the DNA test results satisfied Rule 902(11) or was otherwise authorized by statute.

*1. The Certification Did Not Comply with Rule 902(11)*

¶ 49    The record includes a notarized certification from Dr. Trapani which stated she "read the foregoing report on the analysis of the specimens of the above named individuals, signed by myself and under penalties for perjury it is my belief that the facts and results therein are true and correct." Below this, a public notary acknowledges Dr. Trapani appeared before him and has been authorized by LabCorp to "execute the foregoing on behalf of the corporation." In other words, Dr. Trapani read the report, signed it, and believed the results to be true and correct, and she had authority to execute the certification on behalf of LabCorp.

¶ 50    Rule 902(11) requires a custodian or other qualified person certify, under penalty of perjury, that the record meets the requirements of 803(6)(A)–(C). NMI R. EVID. 902(11).[5] Although we have not previously defined the contours of what 803(6)(A)–(C) requires of a 902(11) certification, we have articulated what is

---

4    Rule 902(12) governs certifications from foreign jurisdictions which is not applicable here. NMI R. EVID. 902(12).

5    The full text of 902(11) is:

> Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person according to Commonwealth or federal statute or rule. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them. As used in this paragraph, "certification" means a written declaration under oath subject to the penalty of perjury.

required of a qualified witness under 803(6)(D) to prove 803(6)(A)–(C). *Commonwealth v. Taitano*, 2005 MP 20 ¶¶ 17–19.

¶ 51   A witness from the organization familiar with the regularly conducted activity must testify to be qualified. *Id.* The witness need not have personal knowledge of the individual record's preparation but only need testify broadly to the record procedures and if the record complies with the organization's policies. *Id.* This testimony can be barebones. *Commonwealth v. Xiao*, 2013 MP 12 ¶¶ 72–73. However, the testimony must establish the organization routinely conforms with the policy; if the policy is not followed regularly, testimony about the policy cannot lay the foundation to admit a record. *Commonwealth v. Ogumoro*, 2020 MP 8 ¶¶ 56–57.

¶ 52   The certification here does not state who created the test results or when, only that Dr. Trapani read the test results and believes them to be true, failing to satisfy 803(6)(A). This certification also does not state LabCorp regularly makes or maintains such records as part of its ordinary business practices as required by 803(6)(B)-(C). The trustworthiness of records under 803(6) is guaranteed by the records being created and maintained in a uniform and consistent way independent of litigation, not the individual expertise of the certifier or their personal belief in the validity of the results. *See Marianas Ins. Co. v. Hossain*, 2017 MP 14 ¶ 11 (discussing applicability of exception based on relationship to litigation, not the individual expertise of the witness).

*2. The DNA Test Results Were Certified by Statute*

¶ 53   Rule 803(6)(D) permits the foundational requirements for admission of a record of a regularly conducted activity to be established not only through testimony or Rule 902(11) and 902(12) certifications but also certification "by statute." NMI R. EVID. 803(6)(D). Although 8 CMC § 1711 does not expressly reference hearsay or certification, it establishes a comprehensive statutory framework governing court-ordered DNA testing in parentage proceedings, including the selection of qualified experts and the evidentiary weight assigned to their results.

¶ 54   Under 8 CMC § 1711, the court—not the parties—determines the number and qualifications of experts authorized to conduct DNA testing. The statute further directs the court to assign legal presumptions to qualifying test results.[6] This statutory scheme reflects a legislative judgment DNA test results generated pursuant to court selection and oversight possess sufficient indicia of reliability to be relied upon in adjudicating parentage. When such results are ordered, received, and relied upon by the court in the ordinary course of its proceedings,

---

[6]   This statutory scheme of automatic legal presumptions contrasts with 6 CMC § 6604, which governs court-selected psychiatrists in criminal proceedings. The court-selected psychiatrists' testimony is subject to objections from either party as to "the evidence adduced as though the psychiatrist were called by an adverse party." 6 CMC § 6604(h).

8 CMC § 1711 functions as a statutory mechanism substitutes for the live foundational testimony otherwise required under Rule 803(6)(D).

¶ 55    This interpretation does not create a new hearsay exception or dispense with Rule 803(6)'s reliability requirements. Rather, it recognizes the statute itself supplies the assurance of regularity and trustworthiness Rule 803(6)(D) seeks to confirm. The DNA test results here was generated by a laboratory selected by the court pursuant to statute, prepared in accordance with standardized testing procedures, and transmitted directly to the Judiciary. In this narrow context, requiring additional testimonial or formal certification would elevate form over substance and undermine the statutory design.

¶ 56    This reading also aligns with the underlying purposes of the hearsay rules. The principal dangers of hearsay—insincerity, ambiguity, faulty memory, and misperception—are not meaningfully implicated where testing is conducted by a neutral, court-selected laboratory with no stake in the outcome of the proceeding. *See Aguon v. Marianas Pub. Land Corp.*, 2001 MP 4 ¶ 20 (describing the risks hearsay exceptions avoid when deciding whether the catch all exception applies). It is generated pursuant to regularized procedures, relied upon by the Judiciary itself, and insulated from adversarial manipulation; it satisfies many of the traditional justifications for hearsay exceptions. *See id.* (listing regularity in procedure and out-of-court reliance by others as some of the factors that lie behind the hearsay exceptions).

¶ 57    Importantly, this holding is limited to DNA test results produced pursuant to court order under 8 CMC § 1711. It does not excuse parties from satisfying Rule 803(6) when offering privately obtained DNA evidence, nor does it permit admission where circumstances indicate a lack of trustworthiness. *See* NMI R. EVID. 803(6)(E). Where, as here, the probate court itself initiated the testing process and received the results in accordance with statutory authority, the requirements of Rule 803(6)(D) are satisfied.

¶ 58    Accordingly, there was no abuse of discretion in admitting the DNA test results under the records of a regularly conducted activity exception to the hearsay rule.

### D. The DNA Test Results Did Not Violate the Rules Governing Expert Testimony

¶ 59    The CNMI adopted the *Daubert* standard to govern the admissibility of expert testimony rule. *Commonwealth v. Crisostomo*, 2018 MP 5 ¶ 19. This standard requires courts to determine whether the expert testimony constitutes scientific knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue. *Id.* ¶ 17. The test is meant to be flexible and the trial court has "broad latitude" both in determining how to assess reliability and in deciding whether the testimony is admissible. *Id.* ¶ 18. The analysis is necessarily fact-specific, acknowledging "many different kinds of experts." *Id.*

¶ 60    In ordering the test from LabCorp, the probate court deemed LabCorp and its agents qualified to provide reliable expert scientific testimony. The court's

authority to determine the "number and qualifications of the experts" who perform drug testing is expressly recognized by statute in 8 CMC § 1711(c). The certification from Dr. Trapani described the nature and purpose of the testing. She described the result of the study and its implications. She identified her qualifications, including a Ph.D and an American Board of Criminalistics' Molecular Biology certification, and attested to her authorization to act on LabCorp's behalf. Given these circumstances, there is no abuse of discretion in finding the test satisfied the reliability requirements for expert scientific evidence.

### E. The Probate Court Correctly Found Sarah Was Not Francisco's Heir

¶ 61    Under 8 CMC § 1704, a child born during a marriage is presumed to be the child of the husband. Only clear and convincing evidence can rebut that presumption, such as a court decree establishing the paternity of another man. *Id.* Where competing presumptions arise, the statute directs courts to apply the presumption "founded on the weightier consideration of policy and logic." *Id.* Sarah advances two arguments as to why, even accepting the DNA test results as admissible, the probate court erred in concluding she was not Francisco's heir.

### 1. The DNA Test Results Were Clear and Convincing Evidence

¶ 62    Sarah first argues the DNA test does not conclusively disprove Francisco was her father as it remains theoretically possible either Francisco or Vicente was adopted secretly. Sarah offers no evidence to support this claim but argues its possibility means the DNA test is not clear and convincing evidence as required by 8 CMC § 1704 to rebut the presumption of paternity. When the asserted error is the evidence fails to satisfy the clear-and-convincing standard, our review is limited to whether the trial court's findings are supported by competent and substantial evidence. *In re Discipline of Lizama*, 2 NMI 360, 377 (1991). In conducting this review, we give "particular weight" to the trial court's assessment of conflicting and ambiguous evidence. *Id.*

¶ 63    The heirship determination relied on the DNA test result which showed a likelihood ratio of 1,000 to 1 Sarah was not biologically related to Vicente. She offered no evidence suggesting either brother was adopted, incorrect samples were tested, or the DNA test's methods were unreliable. Beyond technical objections to the certification's compliance with the evidentiary rules, Sarah offered no basis to undermine the substance of the results. The DNA test was therefore competent and substantial evidence on which the probate court rested the heirship determination.

### 2. No Competing Presumptions Required Weighing

¶ 64    Sarah further argues the presumption in favor of legitimacy for children born in a marriage as well as the presumption in favor of parentage from a DNA test must be weighed when they conflict. *See* 8 CMC § 1704 (b) (describing how to rebut a "presumption under this section" and stating "[i]f two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier consideration of policy and logic controls"). 8 CMC § 1711(d) creates a presumption in favor of parentage where genetic testing

establishes a probability of 95% or greater. However, a lower probability does not create a presumption against parentage. No presumption could be created as no legal relationship would come from a finding of biological non-relation. The test result of a non-biological relationship is evidence against a relationship between Sarah and Francisco, not a competing presumption.

¶ 65    Because no competing presumption of parentage existed, there was nothing to weigh under § 1704(b). The cases cited by Sarah involve disputes with multiple parties claiming parental rights, requiring courts to choose between presumptions grounded in different factual and policy considerations. *In re Jesusa V.*, 85 P.3d 2, 6 (Cal. 2004); *People ex rel. C.L.S.*, 313 P.3d 662, 664 (Colo. App. 2011). These facts are not present here.

¶ 66    The probate court was presented with a statutory presumption of legitimacy and clear and convincing DNA evidence rebutting that presumption. It did not err in concluding that Sarah was not Francisco's heir.

## V. Conclusion

¶ 67    For the reasons discussed above, we hold the Guam Divorce Decree is not entitled to full faith and credit as it related to distributing Francisco's property in Saipan, consent was necessary for the ordering of the DNA test, consent was present, the DNA test results did not violate the rule against hearsay, the DNA test results did not violate the rules on expert testimony, and there was no need to weigh the presumptions. We AFFIRM the probate court's determination that Sarah Kapileo is not an heir of Francisco Kapileo.

So Ordered this 13th day of March 2026.


/s/
ALEXANDRO C. CASTRO
Chief Justice


/s/
JOHN A. MANGLOÑA
Associate Justice


/s/
PERRY B. INOS
Justice Pro Temp


COUNSEL

Joseph E. Horey, Saipan, MP, for Appellant.

Stephen J. Nutting, Saipan, MP, for Appellee.

NOTICE

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it remains subject to revision or withdrawal. If any discrepancies arise between this slip opinion and the opinion ultimately certified for publication, the certified opinion will control. Readers are requested to bring any errors to the attention of the Clerk of the Supreme Court at P.O. Box 502165 Saipan, MP 96950; telephone (670) 236–9715; or e-mail Supreme.Court@NMIJudiciary.gov.*

E-FILED
CNMI SUPREME COURT
E-filed: Mar 13 2026 05:03PM
Clerk Review: Mar 13 2026 05:04PM
Filing ID: 78716464
Case No.: 2024-SCC-0022-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**IN THE MATTER OF THE ESTATE OF FRANCISCO OMAR KAPILEO,**
*Deceased*.

---

**Supreme Court No. 2024-SCC-0022-CIV**
Superior Court No. 21-0295

### JUDGMENT

Appellant Sarah Kapileo appealed the Superior Court's Order, finding she was not an heir of decedent Francisco Kapileo. For the reasons set forth in the accompanying opinion, the Court AFFIRMS the order.

ENTERED this 13th day of March, 2026.


 /s/
_____
JUDY T. ALDAN
Clerk of Court